Good morning. May it please the Court, Jonathan Libby appearing on behalf of the Appellant Robert Oberholtzer. Your Honours, this Court has held that a prima facie case of jury tampering is shown and a presumption of prejudice applies when an intrusion, such as improper conduct or contact, interferes with the jury's deliberations by distracting one or more of the jurors. Here, the District Court erred by failing to either replace Juror Blaker or grant a mistrial after it was discovered that the jurors had been distracted throughout the trial by a spectator who later had physical contact with Blaker during the course of deliberations. This Court's concern is that improper contact may well have prevented a juror from thinking about the evidence or paying attention to the judge's instructions. And when you look at the record here, that's precisely what took place. Juror Blaker, first, submitted two notes to the judge. One asking that the woman spectator be removed from the courtroom for the remainder of the trial. The second note indicated that she, along with the defendant, had had communication with him and had physically touched him while they were on the way to lunch during the course of deliberations. Now, it's interesting to also read, once the Court did hold a hearing and had Juror Blaker explain the situation, the juror explained exactly how much both he and the entire jury had been distracted by this individual throughout the entire course of the trial. For example, he says, she has been in the courtroom since the get-go, distracting us for the whole entire time, putting on makeup and flipping her hair, getting up, moving her bag, moving from seat to seat, going in and out of the courtroom the whole time. We've been talking about it since day one. Counsel, is your concern that the jury was distracted in such a way that they were not able to focus on the evidence and thereby not render a good verdict? Or is your concern that because they were distracted that they imputed this to Mr. Oberholzer and held it against him? I think both, Your Honor. In terms of the distraction, certainly if Mr. Blaker is able to describe exactly what's been taking place in the courtroom with this woman throughout the course of the trial, he's paying attention to this woman in the audience, not paying attention to the evidence. So that certainly indicates But, of course, that affects both sides, and presumably affects both sides equally unless she's only fiddling with her hair and doing her makeup during one presentation or the other. We don't have any evidence of that. But, of course, it's only Mr. Oberholzer who's on trial. Right, but we don't have any evidence as to whether she's distracting them from listening to the AUSA or whether she's distracting them from listening to you. Well, that's true. That's true. We don't have any evidence on that. It is sort of a general, this is a general distraction problem. This is a general distraction that he and the jurors have been talking about and have been focusing on since the very beginning of the trial. At least, this is what Blaker had said. Then he goes further and discusses, once they began deliberations, there was a read-back that was requested. And Judge Huff was presiding over the read-back and says to him, since Blaker was the jury foreperson, Mr. Blaker, you are the jury foreperson, and he says nothing. And what he says to the court during the hearing, and he said my name. And, to be honest with you, with her presence in the court, I didn't even really want to know who, in fact, he was. And then says, the Judge Huff said to him, well, is that you, Mr. Blaker? And I'm like, yes, it's me. And she, at that point, positioned herself so I could stare, so she could stare at me. And I noticed it. And I decided I always want to stare back at her. And at that point, she winked at me. And he explains that she was so distracting to him, he wasn't even able to respond to Judge Huff during the course of the read-back. He then goes on to describe the physical contact that took place. And the physical contact, he explains that they were going out to eat lunch during the course of the liberations, walking from the Spring Street Courthouse over to the Roy Ball Federal Building. And some other jurors had mentioned to him that this same woman was approaching. And what Blaker says was, and so I just, I was determined, regardless of whether she was there or whether she was not, that I was going to ignore her because I don't have anything to prove to that woman. But it was clear that she had something to prove to me. And I wasn't sure until she walked right up next to me with the defendant in her arm, hooked arm in arm, as she walked right up to me as I was standing there and turned and brushed me and said, oh, let's go somewhere else. And needless to say, I was a little uncomfortable with that. So this juror is distracted throughout the course of the trial. He's distracted during the course of the liberations. He expresses some level of fear that this woman now knows his name. He expresses that he's uncomfortable with this physical contact with the woman. He's now identified that this woman is associated with the defendant himself. And that clearly then shows he could potentially put that against Mr. Oberholzer. Now, there's no indication, of course, and the government doesn't even suggest, that Mr. Oberholzer had played any part in this woman causing distractions. But the bottom line is, it did cause distractions, at least to Mr. Blaker. And as a result, Mr. Blaker should have been removed from this jury. It raises significant questions whether or not he could be fair. And when you go back and you... Didn't the court conduct a full inquiry into this question? Well, you know, I'm not sure that the court did, in fact, conduct a full inquiry. There was certainly a hearing that was held. And certainly, Mr. Blaker was addressed one-on-one with Judge Snyder. Though the judge refused to actually voir dire the jurors individually, and only discussed generally with the jurors whether or not they were affected by this. Which of course, it doesn't actually matter whether or not they indicated they could be fair and impartial. This court has said, you know, because jurors are often reluctant to disclose whether they were influenced by an improper contact, we can't take that into account, that they say they can still be fair. And that's the only question that Judge Snyder asked these other jurors. So we don't know, in fact, if any other juror was affected by this. And Judge Snyder also refused our request to ask the individual jurors whether any other jurors were affected by this contact. And presumably, it was under 606B that that wasn't permitted, but that's just not a fair reading of 606B. 606B permits judges to go into, specifically, a juror may testify on a question whether extraneous prejudicial information was improperly brought to the jury's attention. Was it ever revealed to the jury what her relationship was to the defendant? Well, we don't know. We know that juror Blaker believed there was a relationship. We know that juror Blaker said that he had discussed the incident. And we also know that the rest of the jury was there when this physical contact took place. Now, most of them said they didn't see the actual contact, but they did indicate that they saw the woman. And the woman, as we know from Mr. Blaker, was there arm-in-arm with Mr. Oberholzer. So I think that it's reasonable to infer that, yes, the entire jury was certainly aware that there was some relationship. Prior to the physical contact, which I gather took place fairly late in the trial after a number of distracting incidents, was there any reason to have connected her to Oberholzer? Not that I'm aware of. There's certainly nothing in the record. If she was distracting, then it's possible that she was the AUSA's girlfriend, or... That's certainly possible. That's right. There's certainly nothing in the record to indicate that there was some connection there. But there's certainly, based on everything that Blaker said, we go back to the Remmer cases from the Supreme Court. When the Supreme Court actually reversed a conviction based on jury tampering, one thing that the court looked at was the effect on a particular juror. And in that case, it was Juror Smith, where the court says, quote, so disturbed was Smith that he told the judge about it. Well, so disturbed was Mr. Blaker that he sent two jury notes to the court. The court also said in Remmer, state of the facts are such that no one could say Juror Smith was not affected in his freedom of action as a juror. And I think that's the same here. Certainly, if this is all Mr. Blaker's talking about, and has been talking about it since day one, then no one can say that this didn't have any effect on his ability to act as a juror. If we agree with you that there was some kind of jury tampering, do we run a harmless error analysis? Well, no, because then the presumption of prejudice applies. And that's the presumption of prejudice that the Supreme Court established in the Remmer case. How do you overcome the... Is that an irrebuttable presumption? It's not an irrebuttable presumption, but no court has found the government to have overcome that presumption of prejudice. It's a very high standard for the government to meet. And the government, certainly in its briefing, did not suggest it could overcome that standard here. Most of these jury tampering cases, though, isn't it true that the jury tampering could be traced back to the defendant? Here, what you're telling me is there's nothing in the letter which says there's a connection between this woman, whoever she is. We don't even know who she is or what relationship she had. There's no connection with the defendant. There's no... Well, Blakert did testify that he was aware of the connection during the course of deliberations. He saw arm and arm. Arm and arm. That's it. That's correct. That's correct. Okay. And the contact was the brush, right? That's my understanding. Okay. Now, I don't know... Well, but in terms of the case law, Your Honor, there's... In terms of the case law, would you agree that all other cases trace the tampering to the defendant? No, Your Honor. And I would point to this court's Rutherford decision, which was a case of jury tampering where the so-called tampering was a group of IRS agents sitting behind the prosecutor. All right. To a party. Here, look, it might be just that this woman enjoyed going in and fussing in a courtroom. That certainly could be. And then somehow hooked up with the defendant... Then do we take it out on the parties? Well, Your Honor, I think the only reasonable inference that can be drawn by the fact that she was arm and arm and that Mr. Blakert felt it necessary to mention that fact. And in fact, in the jury note, jury note three, which is at excerpts of record 515, what the jury note for Mr. Blakert said was, the defendant and his acquaintance approached me, stopped next to me, said something to me, and brushed up against me outside the courthouse. So Mr. Blakert certainly connected this woman to Mr. Oberholzer. And if that's the case, then I would submit a new trial has to be ordered here. Well, I have a basic question. I probably ought to know the answer to it, but this is the second time this case has been up there on appeal. Sort of. Yes, Your Honor. Sort of? It was, we had filed an initial appeal. They're raising the trial issues as well as sentencing issues. We had filed a motion for bail pending appeal for Mr. Oberholzer, which had been denied in the district court and by the circuit. We had filed a motion for reconsideration of the order denying bail pending appeal, which sat around for a while. The Booker decision came out. A motions panel of this court, right after Booker came out, remanded, ordered a forthwith remand with a forthwith issuance of the mandate for resentencing in light of Booker. And I assume that was because he had already served at that point half of his sentence. And so the court sent it back, even though it was scheduled to be before a merits panel for argument just a week after that. For some reason, the motions panel sent it back. And so this court has never addressed the trial issues. Regardless of how it got there, the remand said for sentence resentencing. That's correct. Not for re-argument of the same old issue. Well, it didn't, this court never addressed the trial issues, Your Honor. The court remanded. You have to look at the remand. That's the command of the district court. That's correct. It says re-sentence. Yes. And I read that as a limited remand to deal with the sentencing issues. No. Not to address. Limited remand. How does the district court then go back and take control of all the issues? The court did not do that here, Your Honor. No, no, no. The only thing that took place on the remand was the resentencing. The hearing on the jury issue, this all took place during the course of the trial. Right. No, I understand. And the court never. And the Court of Appeals, in its ultimate wisdom, may have messed up that it gets back to the district court with the command to re-sentence. Right. Not to reach other issues arising prior to sentencing. The court never reached the other issues, Your Honor. The issues. The court being the district court. The district court on remand only addressed the sentencing, which was the subject of the remand. The other issues were not presented to the district court. They were not addressed. So how did they get reinstated? Your Honor. The Court of Appeals has the whole case. It says, well, district court re-sentenced in light of Booker. District court does that. And then you reactivate the other issues that were in the case prior to the remand. So where does the authority come from to re-open the whole case? Well, because again, Your Honor, I read that original remand as a limited remand just to before this court. And to any extent that there was an error there, you would be depriving Mr. Oberholzer of his due process right to adjudicate his appeal on these trial issues. And I don't believe that the court's remand, as you said, perhaps it was a mistake, should be held against Mr. Oberholzer. This is his first opportunity to actually adjudicate these trial issues. And so I think it's fairly before the court. And with that, I would reserve the balance of my time. Thank you. Good morning. May it please the Court. Assistant United States Attorney Darwin Thomas appearing for the government. Your Honors, the defendant's reliance upon this jury tampering issue is really traced to the Rutherford case in this circuit. And the circumstances, the facts in this case are dramatically different from those in the Rutherford case. And the most important thing is that there was, in the Rutherford case, there was actual testimony, evidence presented from jurors after the fact that they had been influenced or somehow intimidated by the actions that were attributed to the parties. And furthermore, the government in that case, the government agents. Furthermore, the fact that there was government action involved, I think, caused the court to, of course, take a very strict view of the circumstance in that case. In this case, there was no evidence that the jury was in any way biased or prejudiced or influenced in any material way. The court conducted an inquiry. The jurors were questioned. And the presumption of prejudice simply does not apply in this case. There really was no communication, contact, or tampering with the juror about the matter pending before the jury. And in fact, the actions of this woman in the courtroom and even the incident on the street are really very neutral in their entirety. As Judge Bivey has pointed out, I believe the combing of her hair or the putting on of makeup or something, standing alone, does not tell us anything that she was trying to influence the jury or distract them from certain evidence or anything of that nature. And even the brush against Mr. Blaker out on the street, the woman simply said something in the nature of, oh, maybe we should go somewhere else. And apparently, she was addressing the person that she was with, who I guess was the defendant, and didn't really say anything to Mr. Blaker. The other jurors, when questioned by the court, I think that none of them actually saw the contact. A couple of jurors said they did notice that the woman was there or had approached the place where they were standing waiting to go across the street or whatever it was. So in this instance, the presumption of prejudice that was defined in the Remmer case simply doesn't apply. And the judge made an adequate inquiry in the district court to exercise her discretion and determine that this was not an incident that required some sort of evidentiary hearing. At most, the jury would not even know prior to the time that they saw her on the street, or one of them saw her at least with the defendant, that she was associated with one party or another. Since the contact was not coercive and was not about a matter that was pending before the jury, and since there was no threat or inducement made or offered, no suggestion made as to an outcome or an issue that was before the jury, no word spoken, we can't simply presume prejudice, which I think is what the defendant is asking us to do. The defendant needs to make some prima facie showing that prejudice occurred or was likely to have occurred. And the facts in this case simply don't support that. When Mr. Blaker was questioned by the court about whether the woman had, he said the woman had nothing to do with the jury's decision in the case, and when asked if he would feel negatively towards the defendant because of the contact, he replied, absolutely not. I mean, he was very affirmative and direct that this had nothing to do with the evidence or their work in the case. I will move on to another issue unless the court has some questions it would like to pose to me on that issue. The primary issue that was raised, or at least the first issue that was raised by the defendant, is whether the evidence was sufficient to support a finding of willfulness beyond a reasonable doubt by the jury. And the defendant suggests that the Cheek case has somehow changed the standard of proof that's necessary in proving willfulness under the tax statutes. The defendant misinterprets Cheek, and the suggestion that it's Cheek, in fact, involved a supplemental jury instruction, or more than one supplemental jury instruction given by the court to a deadlocked jury. And the issue involved whether Cheek's testimony that he had a good faith belief that his wages or income were not subject to tax under the federal tax system, whether that was held in good faith. And in the supplemental instructions, the district court in the Cheek case had indicated that there had to be an objective, reasonable holding of such belief, which the Supreme Court reversed and said that the standard was subjective. But the Supreme Court never suggested that somehow the elements needed to prove willfulness had been changed. The definition of willfulness being a voluntary, intentional violation of a known legal duty had been around for some time before the Cheek case went to the Supreme Court. Defendant's assertion that the prosecution needs to prove his knowledge of some specific statute or rule prohibiting a person from lying about his or her charitable contributions on a tax return, or a specific statute or rule prohibiting a person from lying about their business expenses, slices a bit too thin. I mean, carried to its illogical conclusion, the argument could be there was no specific statute around or rule that said that a person that only had $5,000 of charitable contributions was not allowed to claim $10,000. It's really absurd. The legal duty that the defendant violated was the duty not to assist in the filing of false and fraudulent tax returns. Case law is clear that willfulness can be proved with circumstantial evidence, and here the circumstantial evidence is clear. The defendant was an experienced tax return preparer for many years. He signed the tax returns under penalty of perjury, swearing them to be true, correct, and complete to the best of his knowledge. The defendant made up false numbers, which he used on the tax returns, and the defense argued in this case not to worry about receipts if he got audited by the IRS because the defendant would come up with the necessary receipts. These facts clearly prove willfulness beyond reasonable doubt, and viewed in a light most favorable to the government, a jury could logically conclude that the defendant had acted willfully in this manner. Counsel, I want to ask you about the sentence. I assume that you're aware of our en banc cases in Cardi and Zavala? Yes. And the Supreme Court's recently granted certain two cases, Rita and Claiborne, which may have an effect on our decisions in Cardi and Zavala. What's the government's position with respect to whether Cardi and Zavala will inform our judgment in this case? I think they will. The government's position is that we should hold the decision in this case pending Cardi and Zavala? The primary position would be that Zavala doesn't control the decision here, because if you look at the transcript factually, it is very much distinct from the problems in the Zavala case. Yeah, but Zavala's already been vacated. Yes. But to the extent that the court would be guided by the decision in Zavala or the cases that were recently certified to the Supreme Court, it would be logical to wait for those. So if you don't have any further questions about the sentencing issue, I would make a comment about the fine and be done. That's the last issue raised by the defendant, is that the fine was not legal. And I think, as best I understand it, the defendant hangs his hat on the fact that the court did not resolve a factual dispute that they raised with the PSR. But I don't believe that a factual dispute was ever raised with the PSR. The PSR stated that the defendant had $60,000 of savings, and by the time they got to court, the defendant showed up and said, no, it's only $38,000 at this point because I've been spending it. That's really not a factual dispute. And furthermore, by the fact that the court reduced, if you will, or abandoned the $27,500 figure that was suggested by the PSR and instead imposed a $10,000 fine, suggests that the court, in fact, believes the defendant that his assets had been depleted and the fine was substantially reduced. But there was no factual dispute with PSR that needed to be resolved. If the court has no further questions, I'm done. Thank you. Mr. Libby, you have some time remaining. At some point, counsel, I would like you to address the Carter-Zavolli question. And I certainly will, Your Honor. With respect to the jury tampering issue, the government suggests that the spectator had no intent to influence the jury and that that somehow makes a difference and that the presumption of prejudice doesn't apply here. In fact, just looking at the Rutherford case, which controls here, I'll quote from Rutherford. We have applied the Remmer-Maddox rule in a number of cases and have consistently stated that the appropriate inquiry is whether the unauthorized conduct or contact is potentially prejudicial, not whether the parties alleged to have tampered with the jury did so intentionally. That's in Rutherford. It also relies on this court's decision in Henley, which stated that the presumption of prejudice applies upon a showing that the intrusion interfered with the jury's deliberations by distracting one or more of the jurors. It's potential prejudice here. That's all that has to be shown in order for the presumption of prejudice to apply. And we believe that we have established the presumption of prejudice and that the government has not rebutted it. Counsel, supposing a defendant goes and hires a jester who sits out there and does all kinds of things during the trial and the judge, being old like I am and not being able to see too well, pays no attention to it. All right. My question is, is that going to be enough to say that, oh, well, I was prejudiced even though I hired this jester to sit back there. I was prejudiced and therefore I should get off free. Only if one or more jurors indicated to the court that they were so distracted by that jester during the course of the trial and the deliberations. Fine. Even say, I can remember a particular case a long time ago, but a person comes in, he's charged with serious crime, he hires a beautiful young woman. You know, the whole bit. She's most appealing. She's fussing. She's doing whatever it is. And it's his intention to distract the jury. All right. And a juror writes in and says, judge, I'm distracted by this beautiful woman. Would you please throw her out? Judge says, she hasn't done anything that I can throw her out for. Okay. We still going to reverse a conviction in those circumstances? Remembering that it's the defendant who did this intentionally and willfully. And as we've indicated in our briefs, if there's any evidence to the record whatsoever that the defendant played any role in causing the distraction, then clearly that can't benefit the defendant. Clearly. Okay. Now, the only evidence that this person had any contact whatsoever is evidence that she was seen going to lunch with him. Right? That's right. Well, and the concern there, of course, is the fact that the juror did see that means that he may have associated that individual with the defendant. But whether or not she was associated with the defendant or whoever, the issue is whether the juror was distracted and unable to carry out his duties as a juror to impartially and fairly review the evidence. Did you ask the district court to make this record whole by questioning the person or questioning the defendant concerning this? Ever? Concerning whether or not he had an... Who was this woman who was there? Simple. Ask the defense counsel. Find out who was this woman who was there? Well, I would submit the defense didn't bring it up because it certainly wasn't relevant to the analysis, which is what our position is here. It's not relevant to the analysis. The issue is whether... Well, suppose and I think it is relevant. Well, then... And you have left a hole in the record where we can speculate one way or the other. Well, I would submit since there is still, based on this record, the possibility that... Possibilities are wonderful, but you need more than that to overturn a jury verdict. I disagree, Your Honor. Respectfully, this court's decision in Rutherford says exactly that. It is whether the potential prejudice existed. And that's the standard that this court finds and applies. And with respect to the sentencing issues, we would certainly agree that this court needs to wait until... Well, certainly according to Zavala, I think likely Claiborne and Rita before it can address the issue. And certainly in the Claiborne case, it's specifically addressing the issue of going outside the... Whether one has to have extraordinary reasons to go outside the guidelines, which essentially is our argument in this case. Counsel, one more question, if you would, please. I know you're over time, but I'm the one responsible for making you over time. Is your defendant in or out? He is currently out. When he was resentenced, Judge Snyder did grant him bail pending appeal. Okay. All right. Thank you. Thank you. Thank both counsel for the argument.
judges: T.G. Nelson, Bybee, Duffy